Filed 7/18/24  In re Royal G. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re ROYAL G., a Person Coming Under the Juvenile Court Law. | B326637 (Los Angeles County Super. Ct. No. 22CCJP04876A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>TIMOTHY G.,<br><br>Defendant and Appellant. | |

APPEAL from findings and orders of the Superior Court of Los Angeles County.  Marguerite D. Downing, Judge.  Affirmed in part, vacated in part, and remanded in part with directions.

Benjamin Ekenes, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Aileen Wong, Deputy County Counsel, for Plaintiff and Respondent.

_____

Timothy G. (father) appeals from the juvenile court's jurisdictional findings and dispositional orders regarding his youngest child, Royal G. (born Sept. 2022).[1] He contends that one of the jurisdictional findings against him is not supported by substantial evidence, and that the orders removing Royal from his custody, limiting his educational rights, and requiring monitored visitation were improper. He also alleges error under the Indian Child Welfare Act of 1978 (ICWA) (25 U.S.C. § 1901 et seq.).

We vacate the juvenile court's finding that ICWA does not apply and remand the matter for further proceedings. The jurisdictional findings and dispositional orders are affirmed.

## FACTS AND PROCEDURAL BACKGROUND

### I. Initial Referral and Investigation

On or around September 17, 2022, the Los Angeles County Department of Children and Family Services (DCFS) received a report that both Royal and his mother, J.S. (mother), tested positive for cocaine and marijuana at the child's birth. When

---

[1] Royal has a full sibling, M.G., and a half-sibling, D.R., neither of whom are involved in this case.

2

hospital staff tried to talk to father, he "act[ed] very abrasive[,]" refused to provide any information, and unsuccessfully tried to physically remove mother from the hospital. When father became aware that the hospital would contact DCFS, he asked "Man you don't have to report it, do you?"

That same day, a social worker interviewed mother at the hospital. Father left the hospital before he could be interviewed. A few days later, father called DCFS and asserted that he "has nothing to do with th[is] . . . case and that he did nothing wrong."

The social worker met father for an in-person interview later that week. Father denied using cocaine (or any drug other than marijuana), ever seeing mother use cocaine, and being aggressive with hospital staff.

On September 27, 2022, father tested positive for cocaine and marijuana. When a social worker asked him about these results, father continued to deny cocaine usage. When pressed for an explanation, "father stated that he touches a lot of money, and maybe the money had cocaine on it." Father agreed to drug test again on October 17, 2022, but then failed to show. The day after the no-show, father told the social worker that he had been unable to test "due to being busy."

On October 31, 2022, both parents participated in a routine interview. Then they stopped answering or returning the social worker's calls for a month.

On November 30, 2022, the social worker received a voicemail from father in which he said "She's on cocaine sir, she got the baby out here, she don't care." (Bolding omitted.) The following day, father denied leaving the voicemail. When pressed, father said that he had unintentionally left the message; while fighting with mother, he threatened to call the social

3

worker and actually dialed the number, but had intended to hang up before recording a message. He denied that mother had been using cocaine.

On December 2, 2022, DCFS scheduled a drug test for both parents. Father called a social worker and angrily said, "Don't be hitting my phone talking [a]bout I need to go test. You ain't my PO. I don't have to test for y'[a]ll." Father refused to test, and told the social worker to stop calling him. Later, he called back to apologize. Father ultimately tested positive for ethanol.

## II. Removal

On December 4, 2022, DCFS received a call from Royal's maternal grandmother (maternal grandmother), who was in Las Vegas caring for his two siblings. Among other things, maternal grandmother reported that Royal's siblings had recently stayed with mother and father for two weeks; during that time, the eldest sibling told maternal grandmother that both parents "were out all night and sleep all day," and that "there was . . . minimal food in the house." Maternal grandmother expressed concern about Royal's safety.

Subsequently, DCFS obtained an emergency removal order. When social workers arrived to remove Royal, "[i]t appeared that . . . father was still sleeping, despite the time being around 12:30[]pm" in the afternoon.

On December 19, 2022, the juvenile court detained Royal from his parents. It also ordered random drug testing and monitored visitation for both parents.

### III. Jurisdiction Petition

On December 16, 2022, DCFS filed a petition pursuant to Welfare and Institutions Code section 300, subdivision (b)(1),[2] seeking the exercise of juvenile dependency jurisdiction over Royal.  As relevant here, the petition contained two allegations against father:  Count b-2 alleged that father failed to protect the child from mother's substance abuse, and count b-3 alleged that father currently abused drugs, including cocaine.  Both counts alleged that father's conduct "place[d] [Royal] at risk of serious physical harm[.]"

### IV. Subsequent Developments

In late December 2022, Royal was placed with his paternal aunt.  She expressed concern because Royal constantly cried, shook, and resisted any attempts to soothe him.  Since Royal had been exposed to drugs during gestation, DCFS recommended that Royal be assessed by the Regional Center for developmental delays.

The jurisdiction report disclosed that both father and mother had been arrested for possession of a controlled substance earlier that year; father had been convicted of the same crime in 2004.

As of January 10, 2023, father had not responded to multiple requests for additional interviews.

### V. Jurisdiction/Disposition Hearing

In January 2023, the juvenile court held a combined jurisdiction and disposition hearing.  Father denied the allegations against him and objected to removal.

---

[2]     All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

The juvenile court sustained counts b-2 and b-3 with minor amendments.  It also found that removal from father was warranted because "he has at least two prior . . . arrests[]" for substance abuse issues, with one resulting in a conviction, and had tested positive for "various drugs[,]" failing to "provide a clean test."  The court concluded that returning Royal to father would be "detrimental to [the] newborn."

 The juvenile court maintained monitored visitation for the parents and, over father's objections, limited father's educational rights by allowing paternal aunt to "hold educational and regional center authority."  The court explained that the limitation was needed because of the "issues" Royal continued to experience following prenatal drug exposure.

Father timely appealed.

**DISCUSSION**

## I.    Jurisdictional Findings

### A.    *Father's Jurisdictional Challenge Is Justiciable*

DCFS argues that we should dismiss father's jurisdictional challenge as moot because father challenges only one of the two jurisdictional findings against him.

The "principle that '[d]ependency jurisdiction attaches to a child, not to his or her parent' [citation], means that "'[a]s long as there is one unassailable jurisdictional finding, it is immaterial that another might be inappropriate'" [citation].  Thus, . . . the appeal may be rendered moot . . . where there are multiple findings against one parent; the validity of one finding may render moot the parent's attempt to challenge the others." (*In re D.P. (*2023) 14 Cal.5th 266, 283–284.)  However, "'where a jurisdictional finding "serves as the basis for dispositional orders

that are also challenged on appeal" [citation], the appeal is not moot."' (*Id.* at p. 283.)

On appeal, father only challenges count b-3, which alleges that his substance abuse posed a substantial risk to Royal. He argues that his challenge is justiciable because count b-3 was the basis for the juvenile court's removal order. We agree; at disposition, the juvenile court stated that its factual basis for removing Royal from father was his current and historic substance abuse.

Urging us to conclude otherwise, DCFS counters that the removal order "would not . . . change[]" if count b-3 is struck, since "[t]he juvenile court could have made the same dispositional orders that it did because of the unchallenged jurisdictional finding that father failed to protect Royal from mother's substance abuse." This argument is entirely speculative. While the juvenile court theoretically "could have" found that father's failure to protect Royal justified his removal, it did not actually do so. When "stat[ing] the facts on which [its] decision to remove [Royal from father] [was] based" (§ 361, subd. (e)), the court did not mention any facts relevant to the failure to protect allegation; it only focused on father's past and present drug use.

Contrary to DCFS's suggestion, we cannot simply infer that the juvenile court would have issued the removal order based on its jurisdictional finding that father failed to protect Royal. Evidence that supports a jurisdictional finding does not necessarily provide sufficient grounds for removal. (See *In re Dakota J.* (2015) 242 Cal.App.4th 619, 631 [the clear and convincing evidence standard needed to remove a child from his parent "is a heightened standard of proof, as compared to the preponderance of the evidence standard necessary to find

7

jurisdiction over a child"].)  Absent any suggestion from the
juvenile court that father's failure to protect Royal met the
heightened standard required for removal, we cannot conclude
that the court would have issued its order on this alternate basis.

Because count b-3 formed the sole basis for the disposition
order removing Royal, father's jurisdictional challenge is not
moot.

**B.**    ***Substantial Evidence Supports Count b-3***

1.    *Applicable law and standard of review*

Under section 300, subdivision (b)(1), the juvenile court has
jurisdiction over and may adjudge to be a dependent of the court
a "child [who] has suffered, or there is a substantial risk that the
child will suffer, serious physical harm or illness, as a result of"—
as relevant here—"[t]he inability of the parent . . . to provide
regular care for the child due to the parent's . . . substance abuse"
(§ 300, subd. (b)(1)(D)).

Our Supreme Court recently held that "under section
300(b)(1)(D), 'substance abuse' bears its ordinary meaning of
excessive use of drugs or alcohol[.]"  (*In re N.R.* (2023) 15 Cal.5th
520, 555.)  In addition, "[d]ependency jurisdiction . . . requires
more than just the identification of substance abuse . . . .  A court
must also find that the parent . . . is unable to provide regular
care for a child and that as a result, the child has suffered serious
physical harm or illness or is at significant risk of suffering
serious physical harm or illness."  (*Id.* at p. 556.)

Jurisdictional findings must be made by a preponderance of
the evidence.  (§ 355, subd. (a); *Cynthia D. v. Superior Court*
(1993) 5 Cal.4th 242, 248.)  We review those findings for
substantial evidence—"evidence that is reasonable, credible and
of solid value.  [Citations.]  We do not evaluate the credibility of

8

witnesses, attempt to resolve conflicts in the evidence or determine the weight of the evidence. Instead, we draw all reasonable inferences in support of the findings, view the record favorably to the juvenile court's order and affirm the order even if there is other evidence supporting a contrary finding." (*In re R.V.* (2012) 208 Cal.App.4th 837, 843.) "Substantial evidence may include inferences, so long as any such inferences are based on logic and reason and rest on the evidence." (*In re Madison S.* (2017) 15 Cal.App.5th 308, 318.)

2.     *Analysis*

Father insists that the only evidence of his drug use is a single positive cocaine test, which he argues is insufficient to establish substance abuse. We disagree; the record amply supports the juvenile court's jurisdictional finding regarding father's substance abuse.

DCFS requested three drug tests from father in the four-month period between the initial referral and the jurisdiction hearing. The first test was positive for, inter alia, cocaine, and the third was positive for ethanol. Father failed to show for the second test; his only explanation was that he was "busy." (*In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1217 [without an adequate explanation, a missed drug test may be "properly considered the equivalent of a positive test result"], disapproved on another ground in *In re N.R.*, *supra*, 15 Cal.5th at p. 560, fn. 18].)[3] Thus, two out of father's three drug tests either are or

_____

[3]     In his reply brief, father urges that because "the juvenile court could not compel father to drug test" before taking jurisdiction, "it is improper to hold father's [earlier] failure to participate in voluntary drug testing against him at the jurisdiction hearing." But courts often construe voluntary,

9

may be considered positive for illicit drugs. And as the juvenile court noted, father did not provide one "clean" negative test indicating sobriety.

Despite this record, father consistently denied using any drugs other than marijuana. (See *In re K.B.* (2021) 59 Cal.App.5th 593, 601 [juvenile court could reasonably infer from a parent's "dissembling about . . . drug use" that he was "trying to hide [an] ongoing drug addiction"], disapproved on another ground in *In re N.R., supra,* 15 Cal.5th at p. 560, fn. 18.) Father also evaded DCFS's efforts to interview him, objected to drug testing, and insisted that he had done nothing wrong and did not need to "be involved with DCFS." (See *In re E.E.* (2020) 49 Cal.App.5th 195, 213 [a parent's dishonesty about the extent of his drug use, missed drug tests, and failure to take any steps to address his drug use supports a finding that his substance abuse places his child at risk].)

Finally, father's erratic conduct leading up to the jurisdictional hearing supports the juvenile court's finding. As noted in DCFS's reports, "[c]ocaine . . . is known to cause . . . [among other things,] sleep deprivation, intense anger, volatile mood swings, agitation, . . . [and] impulsivity[.]" Despite appearing sober during scheduled in-person interviews with social workers, father displayed each of these problematic behaviors: After Royal's oldest sibling reported that mother and

---

prejurisdiction drug tests as positive when missed. (See, e.g., *In re J.M.* (2019) 40 Cal.App.5th 913, 923; *In re Lana S.* (2012) 207 Cal.App.4th 94, 104, fn. 5.) The cases father cites to the contrary are inapposite. (See, e.g., *In re Ma.V.* (2021) 64 Cal.App.5th 11, 24 [mother's failure to comply with voluntary mental health services did not justify *removal*, particularly where DCFS failed to adequately interview her service providers].)

father were staying up late at night and then sleeping all day, social workers found father sleeping into the afternoon; father had been combative with hospital staff trying to investigate and report on mother's drug use; one day after agreeing to cooperate with DCFS, father angrily refused to drug test and told a social worker not to contact him further; and during a fight with mother, father impulsively left an accusatory message on a social worker's phone, which he regretted the next day.

None of these incidents on their own necessarily indicate substance abuse. But taken together with father's positive drug tests, his dishonesty about his drug use, and his failure to cooperate with DCFS, they support a reasonable inference that father had a substance abuse problem that endangered Royal.

Father insists that there was no evidence of his inability to provide regular care to Royal, and thus no evidence that his substance abuse put the child at risk. Not so. The record amply supports an inference that father was abusing substances and behaving unpredictably when Royal, a newborn, needed constant care and supervision. (See *In re N.R.*, *supra*, 15 Cal.5th at p. 559 ["a child's youth and maturity level can bear upon the care that the child may require and whether a parent's . . . substance abuse places the child at substantial risk of serious physical harm"].) Father's repeated denials that he used drugs only increased the risk of harm to Royal. (See *In re A.F.* (2016) 3 Cal.App.5th 283, 293 ["'[D]enial is a factor often relevant to determining whether persons are likely to modify their behavior in the future without court supervision'"].)

Father also points to various pieces of evidence that could contradict a finding of substance abuse. But under substantial evidence review, we must affirm "even if there is other evidence

11

supporting a contrary finding." (*In re R.V., supra,* 208 Cal.App.4th at p. 843.)

## II. Dispositional Orders

Father appeals the dispositional orders removing Royal from his custody, limiting educational rights, and requiring monitored visitation. We examine each of these in turn.

### A. *Removal*

#### 1. *Applicable law and standard of review*

The juvenile court may remove a child from his parent upon finding that "there is a substantial risk of injury to the child's physical health, safety, protection or emotional well-being if he or she were returned home, and there are no reasonable means to protect the child. (§ 361, subd. (c)(1).) "'Clear and convincing" evidence requires a finding of high probability. The evidence must be so clear as to leave no substantial doubt. It must be sufficiently strong to command the unhesitating assent of every reasonable mind. [Citations.]' [Citation.]" (*In re V.L.* (2020) 54 Cal.App.5th 147, 154.)

We review removal orders for substantial evidence. (*In re V.L., supra,* 54 Cal.App.5th at p. 154.) Because the juvenile court must make its finding that a ground for removal exists under the clear and convincing evidence standard of proof (§ 361, subd. (c)), "the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011.)

#### 2. *Analysis*

As described above, father's substance abuse resulted in unpredictable behavior, posing a substantial risk of injury to Royal, who required even more consistent care and attention

12

than a typical four-month-old, given his lingering health complications from prenatal drug exposure. The juvenile court reasonably could have concluded that returning Royal to father's custody would pose an ongoing serious risk to his physical health, considering Royal's special needs and father's insistence that he "ha[d] nothing to do with th[is] . . . case and that he did nothing wrong." (See *In re T.V.* (2013) 217 Cal.App.4th 126, 133 ["A parent's past conduct is a good predictor of future behavior"]; *In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197 ["One cannot correct a problem one fails to acknowledge"].)

Moreover, the juvenile court was justified in finding that there were no reasonable alternatives to removal. Father had a history of noncooperation with DCFS. He failed to communicate at all with DCFS for two of the four months between Royal's birth and the dispositional hearing, despite the agency's numerous attempts to contact him. When confronted with troubling information, father provided DCFS with implausible explanations, as when he attempted to explain his positive cocaine test by saying that he had recently handled potentially contaminated cash. And, from the inception of the case, father was abrasive and aggressive with service providers, social workers, and other persons who challenged his authority or his version of events, including the hospital staff attending Royal's birth. This record amply supports an inference that less restrictive protective means such as participation in maintenance services or supervised custody would not be able to adequately protect Royal.

Father advances three counterarguments against this conclusion. First, he argues that removal was not warranted because "there was no substantial evidence Royal had ever

13

suffered physical harm." But "[a]ctual harm . . . is not necessary before a child can be removed. 'Reasonable apprehension stands as an accepted basis for the exercise of state power.'" (*In re V.L.*, *supra*, 54 Cal.App.5th at p. 154.) Nor can a child only be removed, as father argues, "in extreme cases of parental abuse or neglect." Rather, removal is warranted where, as here, "a reasonable trier of fact could have found it highly probable that placement of [Royal] with father would pose a substantial risk of [the child] being harmed by [father's substance abuse], and that there were no reasonable means to protect [Royal] without removal from father's physical custody."[4] (*In re V.L.*, *supra*, at pp. 156–157.)

Second, father asserts that the juvenile court failed to consider "reasonable alternative[s] to removal." Specifically, father urges us to find that the "assertion of jurisdiction over Royal was, itself, a reasonable alternative to removal[.]" Father also argues that the juvenile court could have imposed "a plan of strict supervision" including conditions such as "father's participation in services . . . [and] testing negative for cocaine."

We reject both arguments. Father cites no binding authority for the proposition that jurisdiction, without more, can serve as a reasonable alternative to removal.[5] But even

---

[4]    In reaching this conclusion, we do not, as father implies in his reply brief, construe "the jurisdictional finding[]" as "prima facie evidence that [Royal] c[ould] not be safely left in [father's] physical custody." Instead, we determine that the same evidence warranting jurisdiction independently meets the heightened standard required for removal.

[5]    For these reasons, the dissenting opinion on which father relies is factually distinguishable. (See *In re G.C.* (2020)

14

assuming arguendo that jurisdiction itself could adequately protect a dependent child in some circumstances, as discussed above, neither jurisdiction nor a plan of strict supervision would be a reasonable alternative to removal in this case.  Father's history of failing to cooperate and/or communicate with DCFS shows that no amount of supervision could assure Royal's safety in father's custody.  Court orders mandating random drug tests or participation in services could not sufficiently protect Royal when father had a history of failing to show for drug testing and failing to respond to DCFS check-ins, often for weeks at a time. And father had not addressed or acknowledged his substance abuse or the concerning behaviors fueled by it; as the juvenile court recognized, Royal could not be protected from behavior that father denied ever occurred.

Lastly, father claims that DCFS erred by not "includ[ing] in its [reports] a discussion of the reasonable efforts made to prevent or eliminate removal."  (See Cal. Rules of Court, rule 5.690(a)(1)(B)(i).)  We agree with DCFS that father forfeited this argument on appeal by failing to object to the adequacy of these reports below.  (See *In re M.V.* (2014) 225 Cal.App.4th 1495, 1508 ["courts have repeatedly held that a party's failure to object forfeits appellate review of the adequacy of—or the failure to prepare—mandatory assessment reports in juvenile proceedings"].)  Accordingly, we need not consider father's arguments.

_____

48 Cal.App.5th 257, 273–274 [dis. opn. of Menetrez, J.] [opining that jurisdiction could be a reasonable alternative to removal where "all of the immediate [safety] risks had been addressed" by the time of the removal hearing and "[t]here [wa]s no evidence that those risks were likely to recur overnight and without warning"].)

Regardless, even assuming DCFS's report was insufficient, the only alternatives to removal father identifies could not have adequately protected Royal. Under these circumstances, any failure to comply with California Rules of Court, rule 5.690(a)(1)(B)(i) was harmless.[6]

### B. *Limiting Father's Educational Rights Was Not an Abuse of Discretion*

#### 1. *Applicable law and standard of review*

"Parents have a constitutionally protected liberty interest in directing their child[]'s education. [Citations.] However, when a child is a dependent child, a court may limit a parent's ability to make educational decisions on the child's behalf by appointing a responsible adult to make educational decisions." (*In re R.W.* (2009) 172 Cal.App.4th 1268, 1276; § 361, subd. (a)(1).) "A court-imposed limitation on a parent's educational rights 'may not exceed those necessary to protect the child.'" (*In re R.W.*, *supra,* at p. 1276; § 361, subd. (a)(1).) An order limiting a parent's educational rights is reviewed for abuse of discretion, "bearing in mind '[t]he focus of dependency proceedings is on the child, not the parent.'" (*In re R.W.*, *supra,* at p. 1277.)

---

[6] Father's reliance on *In re Ashly F.* (2014) 225 Cal.App.4th 803 does not assist him, as that case involved the potential alternative of removing one parent from the home while allowing the children to remain with the other parent. (*Id.* at pp. 810–811.) That alternative was not a possibility here. Additionally, unlike Royal, the children in *In re Ashly F.* were not infants who were especially vulnerable to injury in the absence of careful, full-time supervision. (*Ibid.*)

2.     *Analysis*

Father argues that the juvenile court abused its discretion in limiting his educational rights.  Because substantial evidence supports the order, we disagree.  (*In re Daniel C. H.* (1990) 220 Cal.App.3d 814, 839 [no abuse of discretion where substantial evidence supports an order, even if other evidence could support a contrary conclusion].)

A few weeks before the dispositional hearing, Royal faced unique developmental challenges.  At four months old, Royal was constantly crying and shaking and could not be soothed, raising concerns about developmental delays caused by prenatal drug exposure.  And father displayed an "unwilling[ness]" to provide timely, responsive input to various authorities about Royal's needs.  (*In re Samuel G.* (2009) 174 Cal.App.4th 502, 510.) Father refused to provide the hospital with requested information when Royal was born.  He also stopped communicating with DCFS at multiple points, sometimes disappearing for up to a month.  This behavior supports a reasonable inference that father would not always be available or willing to make the timely developmental decisions that Royal needed.

**C.    *Ordering Monitored Visitation Was Not an Abuse of Discretion***

1.     *Applicable law and standard of review*

Fashioning a visitation order "necessarily involves a balancing of the interests of the parent in visitation with the best interests of the child."  (*In re Jennifer G.* (1990) 221 Cal.App.3d 752, 757.)  We will not disturb a visitation order on appeal "unless the [juvenile] court made an arbitrary, capricious, or

17

patently absurd determination.  [Citation.]"  (*In re Brittany C.* (2011) 191 Cal.App.4th 1343, 1356.)

        2.    *Analysis*

Considering father's unresolved substance abuse issues, his dishonesty about and denials of drug use, and his history of noncooperation with DCFS, we conclude that the juvenile court's order for monitored visitation was well within its discretion.  (See *In re R.R.* (2010) 187 Cal.App.4th 1264, 1284 ["Given father's recent drug use and his efforts to keep that information from DCFS and the court, we cannot say the juvenile court abused its discretion in requiring monitored visits"].)

Father argues that the juvenile court erred because it did not articulate a reason for restricting his visitation rights.  But he cites no authority for the proposition that the court was required to do so, or that failing to expressly state the factual basis for a visitation order constitutes an abuse of discretion.  (*Landry v. Berryessa Union School Dist.* (1995) 39 Cal.App.4th 691, 699–700 ["When an issue is unsupported by pertinent or cognizable legal argument it may be deemed abandoned and discussion by the reviewing court is unnecessary"].)  And in any event, the basis for the order is readily inferable; father's drug use, duplicitousness, and failure to cooperate with authorities suggests that periods of unsupervised visitation would not necessarily be safe for Royal, especially given his special care needs.  Thus, a monitoring restriction was in Royal's best interests.

## III.   ICWA

### A.   *Additional Relevant Background*

In December 2022, mother and father each filed an ICWA-020 form denying any Indian American ancestry.  On the basis of

these forms, the juvenile court found that it "has no reason to know that Royal is an Indian child or that the [ICWA] applies."

**B.  *Applicable Law***

"ICWA was enacted to curtail 'the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement' [citation], and 'to promote the stability and security of Indian tribes and families by establishing . . . standards that a state court . . . must follow before removing an Indian child from his or her family' [citations]." (*In re Dezi C.* (2022) 79 Cal.App.5th 769, 780, review granted Sept. 21, 2022, S275578.)

Under California law enacted to implement ICWA, DCFS and the juvenile court have "three distinct duties . . . in dependency proceedings." (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1052.)  The first is the initial duty of inquiry, which DCFS "discharges . . . chiefly by 'asking' family members 'whether the child is, or may be, an Indian child.' ([§ 224.2], subd. (b).)  This includes inquiring of not only the child's parents, but also others, including but not limited to, 'extended family members.'  (*Ibid.*)  For its part, the juvenile court is required, '[a]t the first appearance' in a dependency case, to 'ask each participant' 'present' 'whether the participant knows or has reason to know that the child is an Indian child.'  (*Id.*, subd. (c).)"  (*In re Dezi C.*, *supra*, 79 Cal.App.5th at p. 780; see also Cal. Rules of Court, rule 5.481(a)(1)-(2).)  The second duty—the duty of further inquiry—is triggered if there is "reason to believe that an Indian child is involved" (§ 224.2, subd. (e)), while the third duty—to notify the relevant tribes—is triggered if there is "reason to know . . . that an Indian child is involved" (§ 224.3, subd. (a)).

Numerous appellate courts have weighed in on the consequence of a failure to satisfy the duty of initial ICWA inquiry on appeal from an order prior to termination of parental rights. At least five different types of dispositions have emerged. (See *In re Dominick D.* (2022) 82 Cal.App.5th 560, 563–564, 567–568 [affirming the juvenile court's jurisdictional and dispositional findings and orders, vacating the finding that ICWA did not apply, and remanding for ICWA compliance]; *In re S.H.* (2022) 82 Cal.App.5th 166, 171 ["hold[ing] that when a social services agency accepts its obligation to satisfy its inquiry obligations under ICWA, a reversal of an early dependency order is not warranted simply because a parent has shown that these ongoing obligations had not yet been satisfied as of the time the parent appealed" and affirming findings and orders in their entirety]; *In re Baby Girl M.* (2022) 83 Cal.App.5th 635, 638–639 [dismissing appeal as moot on the theory that no effective relief could be provided]; *J.J. v. Superior Court* (2022) 81 Cal.App.5th 447, 461 [finding that ICWA issue was unripe for review as "any perceived deficiencies with ICWA inquiry and noticing may still be resolved during the normal course of the ongoing dependency proceedings"]; *D.S. v. Superior Court* (2023) 88 Cal.App.5th 383, 387–389, 391–392 [construing appeal as a writ petition seeking order directing compliance with ICWA duties and, upon consideration of the merits, granting the requested relief].)

C. ***Standard of Review***

"On appeal, we review the juvenile court's ICWA findings for substantial evidence. [Citations.] But where the facts are undisputed, we independently determine whether ICWA's requirements have been satisfied. [Citation.]" (*In re D.S., supra,* 46 Cal.App.5th at p. 1051.)

**D.** *Analysis*

Father argues that DCFS erred by failing to ask either maternal grandmother or paternal aunt about Royal's potential Indian ancestry. We agree. DCFS failed to discharge its initial duty of inquiry by failing to make inquiries with these relatives, who were known and available to the agency.[7] (See § 224.2, subd. (b) [requiring DCFS to question "'extended family members'" about possible Indian ancestry]; *In re Dezi C.*, *supra*, 79 Cal.App.5th at pp. 776–777.)

Having found ICWA error, we must determine the remedy. Without conceding error, DCFS urges us to either dismiss father's ICWA challenge as moot or affirm. We instead elect to follow *In re Dominick D.*, *supra*, 82 Cal.App.5th 560 and vacate the juvenile court's finding that ICWA does not apply, remand for compliance with ICWA and related California law, and otherwise affirm the jurisdictional findings and dispositional orders.

In so doing, we recognize that the juvenile court and DCFS "have an affirmative and continuing duty to inquire" into Royal's Indian status as these dependency proceedings continue. (§ 224.2, subd. (a); see also *In re Isaiah W.* (2016) 1 Cal.5th 1, 14.) DCFS "has a duty 'on an ongoing basis' to report 'a detailed description of all inquiries, and further inquiries it has undertaken, and all information received pertaining to the child's Indian status.' ([Cal. Rules of Court, r]ule 5.481(a)(5).) And the juvenile court, even after it concludes that ICWA does not apply, retains the power (and duty) to *reverse* that determination 'if it

---

[7] We also note that the juvenile court failed to ask the parents about any potential Indian heritage, even though they were both present at the detention hearing. (§ 224.2, subd. (c); *In re Dezi C.*, *supra*, 79 Cal.App.5th at p. 780.)

subsequently receives information providing reason to believe that the child is an Indian child.' (§ 224.2, subd. (i)(2); see also [Cal. Rules of Court,] rule 5.482(c)(2).)" (*In re S.H.*, *supra*, 82 Cal.App.5th at p. 176.) Thus, while in some respects, there may be no reason to remand this case at all, we also recognize that we should not allow an erroneous finding to stand when it can be corrected.

## DISPOSITION

The juvenile court's finding that ICWA does not apply is vacated. The matter is remanded for further proceedings in which (1) DCFS shall make reasonable efforts to ask all known and available family members, including maternal grandmother and paternal aunt, whether Royal is or may be an Indian child; (2) DCFS shall document these efforts to the juvenile court; (3) the juvenile court shall make the same inquiry of each parent at their next appearance; (4) the juvenile court shall then make a finding regarding ICWA's applicability; and (5) depending upon that finding, the juvenile court and DCFS shall proceed in accordance with sections 224.2 and 224.4. The jurisdictional findings and dispositional orders are otherwise affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, Acting P. J.
ASHMANN-GERST

We concur:


_____, J.      _____, J.
CHAVEZ                            HOFFSTADT


22